UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-09-138-B-W |
| | ) | |
| BRANDON PETTENGILL | ) | |

**ORDER ON MOTION TO DISMISS**

Charged with possession of a firearm after having been convicted of a misdemeanor crime of domestic violence, Brandon Pettengill moves to dismiss the Indictment, claiming the charges infringe his Second Amendment right to bear arms and asserting a lack of scienter for the predicate conviction. The Court previously considered and rejected both arguments and does so again.

**I.   BACKGROUND**

On September 9, 2009, a federal grand jury indicted Brandon Pettengill for possessing a firearm after having been convicted of a misdemeanor crime of domestic violence, a violation of 18 U.S.C. § 922(g)(9).[1]  *Indictment* (Docket # 2). On December 15, 2009, Mr. Pettengill moved to dismiss the Indictment; on January 5, 2010, the Government filed its opposition. *Mot. to Dismiss Indictment* (Docket # 13) (*Def.'s Mot.*); *Gov't's Resp. to Mot. to Dismiss Indictment* (Docket # 15) (*Gov't's Resp.*). Mr. Pettengill replied on January 19, 2010. *Def.'s Reply to Gov't's Resp. to Mot. to Dismiss Indictment* (Docket # 18). (*Def.'s Reply*).

**II.   DISCUSSION**

    **A.   Motion to Dismiss the Indictment**

---

[1] 18 U.S.C. § 922(g)(9) makes it unlawful for any person "who has been convicted in any court of a misdemeanor crime of domestic violence, to . . . possess . . . any firearm." According to the indictment, Mr. Pettengill was convicted in 2003 of a misdemeanor crime of domestic violence, in violation of 17-A M.R.S.A. § 207. *Indictment* at 1.

"A court should exercise its authority to dismiss cautiously, since to dismiss an indictment 'directly encroaches upon the fundamental role of the grand jury.'" *United States v. Thomas*, 519 F. Supp. 2d 141, 143-44 (D. Me. 2007) (quoting *Whitehouse v. United States Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995)); *see also United States v. Knox*, 396 U.S. 77, 83 n.7 (1969); *United States v. Nai Fook Li*, 206 F.3d 56, 62 (1st Cir. 2000); *United States v. Russell*, 919 F.2d 795, 797-98 (1st Cir. 1990); *United States v. Alfonso*, 143 F.3d 772, 776-77 (2nd Cir. 1998) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."); *United States v. Parker*, 165 F. Supp. 2d 431, 458 (W.D.N.Y. 2001).

**B.    The Second Amendment**

Mr. Pettengill argues that "Congress exceeded its authority in enacting [18 U.S.C. § 922(g)(9)] in that it affects a core right under the Second Amendment which pertains to the individual without sufficient justification to pass either strict scrutiny or even heightened scrutiny." *Def.'s Mot*. at 2. Mr. Pettengill's Second Amendment argument is twofold. First, he argues that there is "nothing in the history of the law of felony and misdemeanor" to support "a conclusion that there is an absence of a meaningful distinction between felons and persons convicted of crimes of domestic violence and the abrogation of an individual right protected by the Constitution, such as the Second Amendment." *Def.'s Mot*. at 7. Second, Mr. Pettengill argues that any restrictions on the Second Amendment right to bear arms, must pass strict scrutiny, or at least intermediate scrutiny, the standard found in *United States v. Skoien*, 587 F.3d 803, 810-14 (7th Cir. 2009). *Id*. at 8.

**1.    *Booker* and the Felony/Misdemeanor Distinction**

In *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) the United States Supreme Court clarified that the Second Amendment guarantees an individual right to bear arms, but explained that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 2816. While the Supreme Court did not "undertake an exhaustive historical analysis" on these limitations, it stated in dicta that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 2816-17. The Court further stated that "these presumptively lawful regulatory measures [are] only . . . examples; our list does not purport to be exhaustive." *Id*. at 2817 n.26.

In *United States v. Booker*, this Court concluded that 18 U.S.C. § 922(g)(9) continues to "pass[] constitutional muster" despite the Supreme Court's holding in *Heller*. 570 F. Supp. 2d 161, 162 (D. Me. 2008). In reaching its conclusion, the Court compared "the constitutionally-sanctioned prohibition against firearm possession by felons with the prohibition against persons convicted of misdemeanor crimes of domestic violence," *id*. at 162-63, and found an "absence of a meaningful distinction between" the two "as predictors of firearm violence." *Id*. at 164. The Court also considered the "critical nature of the governmental interest, and the definitional tailoring of the statute." *Id*. The Court concluded that "persons who have been convicted of crimes of domestic violence must be added to the list of 'felons and the mentally ill' against whom the 'longstanding prohibitions on the possession of firearms' survive Second Amendment scrutiny." *Id*. at 164-165 (citing *Heller*, 128 S. Ct. at 2816-17).

Mr. Pettengill's first argument lifts the Court's phrase "the absence of a meaningful distinction" badly out of context, and erroneously asserts that *Booker* was premised on "a lack of

3

a meaningful distinction between a felony and misdemeanor." *Def.'s Reply* at 2.  Having set up a straw man, he effectively knocks him down, demonstrating unequivocally the undisputed notion that the law has historically drawn important distinctions between felonies and misdemeanors. *Def.'s Mot.* at 3-7.  Thus, Mr. Pettengill concludes the *Booker* analysis must be erroneous, because the Court relied on the patently incorrect assumption that there is no meaningful distinction between a felony and a misdemeanor.

But, the Court's *Booker* analysis, right or wrong, was not based on a myopic denial of the historically significant distinction between felonies and misdemeanors.  In *Booker*, the Court struggled first with a critical issue the *Heller* Court left unanswered: the level of scrutiny to be applied to a statute which affects Second Amendment rights.  570 F. Supp. 2d at 162-63.  *Heller* conceded that the District of Columbia law would survive a rational-basis level of scrutiny, but it struck the law down as unconstitutional, compelling the conclusion that rational-basis scrutiny does not apply to challenges based on the Second Amendment.  *Id*. at 163 (citing *Heller*, 128 S. Ct. at 2818 n.27).  This left either strict or intermediate scrutiny.[2]  *Booker*, 570 F. Supp. 2d at 163.

Rather than attempt to resolve this difficult question, the Court in *Booker* reviewed the categories of prohibited persons the *Heller* Court said in dicta passed constitutional muster and compared those categories to the category of persons who have previously been convicted of a misdemeanor crime of domestic violence.  *Id*. (citing *Heller*, 128 S. Ct. at 2816-17 (stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill").  The premise is that the "longstanding

---

[2] Although the question remains open, it seems unlikely that a statute that criminalizes firearm possession by all persons previously convicted of a misdemeanor crime of domestic abuse would survive strict scrutiny.  In dissent, Justice Breyer pointed out that the *Heller* majority expressly approved some statutory restrictions "whose constitutionality under a strict scrutiny standard would be far from clear."  *Heller*, 128 S. Ct. at 2851.

4

prohibitions" were created as predictors for those who by past conduct had demonstrated their possession of firearms would entail an unacceptable risk to society at large. *Booker*, 570 F. Supp. 2d at 163.

The Court in *Booker* analyzed the prohibition against felons in possession of firearms and noted that a generalized felony conviction is not an especially accurate predictor of future violence. *Id*. at 164. Although some felonies involve violence, countless felonies do not, and thus, a generic felony conviction would not necessarily predict future violence, with a firearm or otherwise. Yet, all felons are constitutionally prohibited from possessing firearms. By contrast, those convicted of a misdemeanor crime of domestic assault have all been convicted of a crime that involves violence against a domestic victim, and as a predictor of those who should not possess a firearm, the Court concluded in *Booker* that this prohibition is more narrowly tailored than the felon prohibition. *Id*. By extension, the Court concluded that § 922(g)(9) should similarly pass constitutional muster, whatever the proper level of scrutiny. *Id*.

Though the analysis in *Booker* highlighted the lack of meaningful distinction between the constitutionally-permissible classification of felons and the statutory classification of perpetrators of domestic violence as predictors of future violence, the same analysis applies with equal force to the other constitutionally-sanctioned prohibitions in *Heller*. As the Court pointed out in *Booker*, *Heller* approved of the broad prohibition against possession of a firearm by the mentally ill. *Id.* at 164 n.2; *Heller*, 128 S. Ct. at 2816-17 (stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill"). But, not all persons who have been diagnosed with a mental illness or persons who have been committed to a mental institution carry a risk of gun violence. Since the Supreme Court constitutionally sanctioned a broad statutory prohibition against possession of a firearm by

5

the mentally ill (and presumably by persons previously committed to mental institutions), the more narrowly drawn prohibition against persons who have been convicted of a crime of domestic violence should also survive constitutional scrutiny.[3]

Marking those categories of firearm prohibitions that *Heller* sanctioned as a base and extending the logic underlying those categories to the category of persons previously convicted of misdemeanor crimes of domestic violence, the Court concluded in *Booker* that the domestic violence category was at least as narrowly drawn as a predictor of firearm violence as the categories the *Heller* Court had approved. To claim that the Court based its analysis in *Booker* on the premise that there is no meaningful distinction between felonies and misdemeanors is to miss the point. The Court rejects Mr. Pettengill's attempt to mischaracterize its decision in *Booker*.[4]

### 2. *United States v. Skoien*

Mr. Pettengill's second argument focuses on the level of scrutiny for Second Amendment restrictions, an issue left unanswered in *Heller*. The First Circuit has not ruled on this issue. In a case challenging the constitutionality of 18 U.S.C. § 922(x)(2), which prohibits possession of handguns by juveniles, the First Circuit noted that "[t]he *Heller* Court did not identify a standard

---

[3] Although not mentioned in *Booker*, this same analysis can be applied to *Heller*'s inclusion of schools and government offices in the category of locations where firearms could constitutionally be prohibited. *Heller*, 128 S. Ct. at 2816-17 (stating that "nothing in our opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"). To the extent the rationale for laws that prohibit a person from bringing a firearm into a school or government building needs justification, the tragic lessons of recent history demonstrate that such places are especially vulnerable as targets for violence. Yet, the breadth of the category assumes that all government offices and schools are equally vulnerable and that other institutions, such as malls, hospitals, psychiatrists' offices, law offices, are not. The point is that *Heller* itself approved some categories of prohibition that are significantly less defensible under intermediate scrutiny than the category of individuals who have been previously convicted of a misdemeanor crime of domestic violence.

[4] *Booker* is not an outlier. In *United States v. Marzzarella*, Judge McLaughlin recently undertook an exhaustive review of developments in case law since *Heller* and concluded that "every court which has considered a Second Amendment challenge to 18 U.S.C. § 922, post-*Heller*, has upheld the statute as constitutional." 595 F. Supp. 2d 596, 598-99 (W.D. Pa. 2009) (collecting cases); *see* Allen Rostron, Symposium: The Second Amendment After District of Columbia v. Heller: Protecting Gun Rights and Improving Gun Control After District of Columbia v. Heller, 13 Lewis & Clark L. Rev. 383, 406 (2009) (describing *Booker* as providing "a particularly cogent analysis").

6

of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and 'interest-balancing.'" *United States v. Rene E.*, 583 F.3d 8, 11 n.4 (1st Cir. 2009). Instead of articulating the appropriate level of review, the First Circuit evaluated the Second Amendment restriction from a historical perspective and concluded that "the law, with its narrow scope and its exceptions, does not offend the Second Amendment." *Id*. at 16.

On November 18, 2009, the Seventh Circuit addressed the level of scrutiny a Second Amendment challenge should face in the context of the prohibition against firearm possession by a person previously convicted of a misdemeanor crime of domestic violence. *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009). Turning first to the level of scrutiny, the Seventh Circuit noted that the defendant had possessed the firearm in that case for deer hunting, and as such, the Circuit observed that his possession did not implicate the "core right of self-defense identified in *Heller*." *Id.* at 805. The Circuit therefore applied an intermediate level of scrutiny.[5] *Id.*

Applying the intermediate standard of review, the *Skoien* Court asked "whether the government has established that the statue is substantially related to an important governmental interest." *Id.* at 805. The Seventh Circuit noted

> No one questions the importance of the government's interest in protecting against domestic-violence gun injury and death. The dispute here is about the fit between this important objective and § 922(g)(9)'s blanket ban on firearms possession by persons who have been convicted of a domestic-violence misdemeanor. Under intermediate scrutiny, the government need not establish a

---

[5] Under *Skoien*, the level of scrutiny may depend on the defendant's purpose in possessing the firearm. Although the Seventh Circuit does not say that if Mr. Skoien possessed the firearm for self protection, a higher level of scrutiny would apply, it does say that since he did not possess the firearm for self protection, an intermediate level of scrutiny did apply. To apply different levels of constitutional scrutiny depending on the defendant's asserted motivation poses some difficult issues, although the Seventh Circuit pointed out that varying treatment is commonplace in First Amendment jurisprudence. *Skoien*, 587 F.3d at 813.

This case reflects one problem, which is what level of scrutiny should be applied when there is no evidence of the purpose of the defendant's alleged possession; as this is a motion to dismiss, the only evidence before the Court is the indictment, which simply alleges possession of two .22 caliber rifles on two different days. *Indictment* at 1-2. Whether Mr. Pettengill possessed these rifles for hunting, for self-protection, or for some other purpose, or combination of purposes is not available at this stage. If the default level of scrutiny is strict scrutiny, the statute could be deemed unconstitutional when the defendant may have actually possessed the firearm for a purpose outside of the Second Amendment's core right of self defense.

7

>close fit between the statute's means and its end, but it must at least establish a *reasonable* fit.

*Id.* at 805-06 (emphasis in original). The Government had elected to rely on the presumption of constitutionality, and the Seventh Circuit concluded that the presumption was not enough to carry the day. *Id.* at 806 (stating "[t]hat's not enough"). It remanded the case to the district court for determination as to whether "the statute is substantially related to an important governmental interest." *Id.* at 805. The *Skoien* Court readily concluded that "reducing domestic gun violence qualifies as an important governmental interest." *Id.* at 814 (citing *United States v. Salerno*, 481 U.S. 739, 749 (1987)). It focused on, however, the "the relationship between the government's means and its end - - whether there is a 'reasonable fit' between the perpetual disarmament of domestic-violence misdemeanants and the important goal of preventing gun violence against domestic intimates." *Id.* On this point, the Government's reliance on the legislative history of the Lautenberg Amendment was deemed insufficient.[6] *Id.* The *Skoien* Court noted:

>The firearms prohibition exists indefinitely; it contains no exceptions nor any basis for potential restoration of gun rights; and it does not require an individualized finding of risk that the domestic-violence misdemeanant might use a gun in a future offense.

*Id.* at 815 (footnote omitted). At the same time, the Seventh Circuit conceded:

>"[T]he statutory definition of 'misdemeanor crime of domestic violence' limits the applicability of § 922(g)(9)'s firearms disability to those who actually used or attempted to use physical force or threatened the use of a deadly weapon in a domestic disturbance. The statute thus targets a specific class of violent offender; only those who have already used or attempted to use force or have threatened the use of a deadly weapon against a domestic victim are banned from possessing firearms.

*Id.* at 815-16 (internal citation omitted).

---

[6] Section 922(g)(9) is also known as the Lautenberg Amendment to the Gun Control Act of 1968. The Amendment was "designed to remedy the disparate treatment between those convicted of a felony involving domestic assault and those convicted of a misdemeanor involving domestic assault." *United States v. Hartsock*, 347 F.3d 1, 4 (1st Cir. 2003).

8

The *Skoien* decision raises important questions about how the Second Amendment as explained in *Heller* should be applied to criminal statutes restricting the right to possess firearms. However, as an opinion from the Seventh Circuit, it is not binding on this Court.[7]

### 3. The Constitutionality of § 922(g)(9)

Based on what the Court has before it now, the record is sufficient to sustain the constitutionality of § 922(g)(9), applying an intermediate level of scrutiny.[8] *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). (stating that to survive intermediate scrutiny, the Government must demonstrate at a minimum that the challenged classification is "substantially related to an important government objective").

First, when the First Circuit addressed the constitutionality of handgun possession restriction after *Heller*, it concluded that the restriction "does not offend the Second Amendment." *Rene E.*, 583 F.3d at 16. No doubt, there are significant distinctions between the prohibition against juvenile possession of handguns and against possession of firearms by persons convicted of domestic violence. One, for example, is that the ban of juvenile possession is not absolute. *Id.* at 13-14 (describing "several exceptions" to the ban on juvenile possession).

Second, the indictment alleges that Mr. Pettengill was convicted in 2003 of violating 17-A M.R.S.A. § 207, by assaulting his live-in girlfriend. *Indictment* at 1. To violate section 207 of

---

[7] It may be that the First Circuit directs the Court to develop the record in this case in the same fashion the Seventh Circuit directed the district court to develop the record in *Skoien*. Yet, when the First Circuit addressed the analogous question of the constitutionality of the prohibition against juveniles possessing firearms, the Circuit did not remand to the district court for development of the record. *Rene E.*, 583 F.3d at 11-16.

[8] The Court considered applying a presumption of constitutionality to the federal statute. *See Heller v. Doe*, 509 U.S. 312, 320-21 (1993). However, as the Supreme Court has noted, the "strong presumption of validity" does not apply to classifications "involving fundamental rights." *Id.* at 320. The extent to which the Second Amendment has been accorded the status of a fundamental right is not clear. *See Heller*, 128 S. Ct at 2816 (stating that "[l]ike most rights, the right secured by the Second Amendment is not unlimited"). In *Skoien*, the Seventh Circuit observed that *Heller* described certain enumerated prohibitions as "presumptively lawful." *Skoien*, 587 F.3d at 808 (citing *Heller*, 128 S. Ct. at 1817 n.26). The *Skoien* Court puzzled over this footnote. *Id.* at 810 (describing the Supreme Court's reference to "presumptively lawful" regulations as "enigmatic"). The Court does not know whether to apply a presumption of constitutionality to the federal statute and in excess of caution will not.

title 17-A, Mr. Pettengill "intentionally, knowingly or recklessly cause[d] bodily injury or offensive physical contact." *See* 17-A M.R.S.A. § 207(1). "Bodily injury" means "physical pain, physical illness or any impairment of physical condition", 17-A M.R.S.A. § 2(5), and "offensive physical contact" means "physical contact which a reasonable person would find offensive under the circumstances." *See* Donald G. Alexander, Maine Jury Instruction Manual § 6-59 (4th Ed. 2003). The First Circuit has determined that these state statutory elements meet the federal statutory requirement that the domestic violence misdemeanor have "as an element, the use or attempted use of physical force." *United States v. Nason*, 269 F.3d 10 (1st Cir. 2001) (concluding that "offensive physical contact" requires "the application of some quantum of physical force, that is, physical pressure exerted against a victim"); 18 U.S.C. § 921(a)(33)(A). Thus, Mr. Pettengill either assaulted his girlfriend by causing her bodily injury or by causing her offensive physical contact, which under First Circuit law amounts to "the use of attempted use of force." Thus, the *Skoien* Court's observation applies: for Mr. Pettengill to fit within the category of misdemeanants prohibited from firearm possession by § 922(g)(9), an individualized determination has been made that Mr. Pettengill used or attempted to use force against his domestic intimate.

Third, the length of time between his domestic violence conviction – 2003 – and the possession alleged in the indictment – 2008 - is five years. Although *Skoien* was concerned about the lifetime ban on the possession of a firearm, here the Government alleges that Mr. Pettengill possessed a firearm within about five years of his domestic violence conviction, a time interval of prohibited possession that on its face is not unreasonable.[9]

---

[9] In *Skoien*, the Seventh Circuit states that § 922(g)(9) does not "permit the offender to reacquire the right to possess a gun on a showing that he is no longer a danger." *Skoien*, 587 F.3d at 811 n.5. Under 18 U.S.C. § 925(c), "[a] person who is prohibited from possessing . . . firearms . . . may make application to the Attorney General for relief from the disabilities imposed by Federal laws with respect to the . . . possession of firearms, and the Attorney

Fourth, the legislative history behind the Lautenberg Amendment convinces the Court that the problem of gun violence against victims of domestic abuse is a matter of grave national concern and Congress has the authority to legislate in this area even though it touches on the exercise of a constitutional right. *Heller*, 128 S. Ct. at 2816 (noting that the right to bear arms is "not unlimited"). In *Rene E.*, the First Circuit recited and relied upon a similar legislative history behind the ban against juvenile possession of handguns. *Rene E.*, 583 F.3d at 13. The Court follows suit.

Finally, the Court draws comfort from its analysis in *Booker*: that other enumerated restrictions against firearm possession less narrowly drawn than the prohibition against firearm possession by those previously convicted of misdemeanor crimes of domestic violence, received the Supreme Court's imprimatur in *Heller*.

The Court concludes that the indictment survives a Second Amendment challenge based on an intermediate level of scrutiny.

### C. Failure to State a Federal Offense

The Court previously addressed Mr. Pettengill's last argument: whether the reckless conduct scienter requirement for a conviction under Maine's assault statute meets the *mens rea* element in the statutory phrase "use or attempted use of physical force." *United States v. Booker*, 555 F. Supp. 2d at 220-27 (*Booker II*). It is true that the United States Supreme Court has not resolved "a circuit split between the First, Eight and Eleventh Circuits, and the Seventh, Ninth,

---

General may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Since 1992, however, Congress has barred the Attorney General (and his statutory predecessor the Secretary of the Treasury) from expending funds to act on applications under § 925(c). *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *United States v. Bean*, 537 U.S. 71 (2002). In *Bean*, an applicant attempted to force consideration of his application for relief under § 925(c); however, the Supreme Court concluded judicial review was authorized only upon an actual denial of the application. *Id.* at 78. As a practical matter, unless Congress authorizes the Attorney General to expend funds on § 925(c) applications, the statute establishes a right without a remedy.

and Tenth Circuits on whether a prior state conviction for simple battery is in all cases a 'violent felony.'" *United States v. Wyman*, CR-08-154-B-W, 2009 U.S. Dist. LEXIS 102549, at *7 n.4 (D. Me. Oct. 28, 2009) (internal punctuation eliminated) (citing *United States v. Johnson*, 528 F.3d 1318 (11th Cir. 2008), cert. granted, __U.S.__, 129 S. Ct. 1315 (2009)). But, intervening silence is an unconvincing basis to alter a decision.

Finally, Mr. Pettengill suggests that "it may be appropriate to hold this motion in abeyance pending the disposition of *Johnson*," since the Supreme Court's decision "may affect the continued validity" of the case law on which *Booker II* is based. *Def.'s Mot*. at 10. As the issuance of this opinion suggests, the Court is determined to proceed forward with Mr. Pettengill's case.[10] First, there is no timetable for resolution of cases before the United States Supreme Court; the Supreme Court takes whatever time it needs, and although the Supreme Court granted certiorari on February 23, 2009, no one can predict when the Court will make its decision. To hold a criminal case in abeyance for however long the Supreme Court takes to resolve a different case seems unwise. Second, there is no guarantee that when the Supreme Court issues its opinion in *Johnson*, it will resolve the issues before this Court. Whichever way the Supreme Court rules, it can be predicted that the more adversely affected party will seek to distinguish *Johnson* from this case. Third, a criminal case rarely improves with age; witnesses may die, disappear, or become ill, memories may fade, exhibits may deteriorate, victims may lose heart. To stay a prosecution for an indefinite time requires a compelling justification, not present here. Fourth, if this case comes to fruition and results in a conviction before the Supreme

---

[10] It is not clear whether Mr. Pettengill is moving for a stay or whether he is just making a suggestion. To the extent Mr. Pettengill's request that the Court hold the motion in abeyance is a motion for a stay, the Court denies it.

Court issues the *Johnson* opinion, the Court has the ability to grant a motion for bail pending appeal if it concludes the issue presents a "substantial question of law."[11] 18 U.S.C. § 3143(b).

### III. CONCLUISON

The Court DENIES Mr. Pettengill's Motion to Dismiss (Docket # 13).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 1st day of February, 2010

---

[11] The Court granted a motion for bail pending appeal in *Wyman* because "whether the reckless conduct required for a conviction under Maine's assault statute meets the *mens rea* element in the statutory phrase 'use or attempted use of physical force' present[ed] a substantial question of law, and under 18 U.S.C. § 3143(b), it [was] appropriate to release him pending appeal." *Wyman*, 2009 U.S. Dist. LEXIS 102549, at *4.